Filed 11/13/20  P. v. Sanchez CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ORLANDO JAVIER SANCHEZ,<br><br>    Defendant and Appellant. | D075963<br><br><br>(Super. Ct. No. SCD274781) |


APPEAL from a judgment of the Superior Court of San Diego County, Esteban Hernandez, Judge.  Affirmed.

Waldemar D. Halke, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Orlando Javier Sanchez of first degree murder of 23-year-old Jordy L. (Pen. Code,[1] § 187, subd. (a); count 1), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). In connection with count 1, the jury found true the allegation that defendant intentionally and personally discharged a firearm, and proximately caused great bodily injury and death to a person other than an accomplice. (§ 12022.53, subd. (d).) The court sentenced defendant to a total term of three years plus 50 years to life in prison.

Defendant on appeal contends the court committed error by refusing to instruct on (1) the lesser-included offense of voluntary manslaughter based on imperfect self-defense or defense of another; and (2) voluntary intoxication. Defendant further contends (3) the jury instructions on perfect self-defense, provocation, and voluntary manslaughter based on a sudden quarrel/heat of passion were prejudicially incomplete and misleading; (4) his conviction must be reversed under the cumulative error doctrine; and (5) the imposition of various fines, fees, and assessments without a finding of ability to pay violated his due process rights. (See *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).)

As we explain, we reject these contentions and affirm the judgment.

FACTUAL OVERVIEW

N.D., a documented Linda Vista 13 gang member, testified he met victim Jordy while growing up in the San Diego neighborhood of Linda Vista. They became good friends and hung out together, although Jordy was not in a gang. N.D. and Jordy were together on October 15, 2016, when Jordy was shot and killed.

---

[1] All further statutory references are to the Penal Code, unless otherwise noted.

2

Although at the time of trial N.D. could not recall many of the details of Jordy's killing, about five days after the shooting N.D. was interviewed by San Diego Police Department detectives including Jesse Zaldivar, which interview was recorded and played for the jury. A transcript of the interview was included in the record.

Detective Zaldivar had known N.D. since about 2011, when the detective began working in a gang unit. N.D. at the time of the interview had been arrested in connection with an unrelated crime. N.D. initiated the contact with police a few hours after Jordy's shooting.

N.D. testified that neither he nor Jordy had any sort of firearm or weapon at the time of the shooting; that he had never seen Jordy carry a gun; and that, prior to the shooting, the two of them had walked to a middle school in their neighborhood and sat on some steps. Although N.D. had gotten "high" the night before and had not slept for three or four days, N.D. testified he and Jordy were not drinking or getting high together on the night of the shooting. Instead, they were just hanging out and talking. At some point well after midnight, they left the school and started walking to the nearby home of N.D.'s cousin M.L.

As they were walking on Morley Street nearing M.L.'s home on Comstock Street, they saw a white car drive by that N.D. later identified as a Scion XB. Two men were inside the car. Neither N.D. nor Jordy recognized either of the men.

Despite the fact they said nothing to the men in the car, N.D. told detectives the man sitting in the passenger seat started "mad-dogging" them. Concerned by the passenger's behavior, N.D. also told the detectives that he and Jordy paused on the sidewalk after watching the Scion turn right on Comstock.

As N.D. and Jordy continued walking, they saw the Scion had parked on Comstock, across the street from M.L.'s home. N.D. told detectives the two men got out of the car and appeared to go into a "courtyard area" of an apartment complex. N.D. and Jordy then went to the front door of M.L.'s home, but found it locked.

About two minutes later, the two men, along with three or four other men, came back outside holding beer bottles. The man who had been sitting in the passenger seat stated to N.D. and Jordy, "Que guey? Que guey?" which N.D. stated meant "What's up fool?" N.D. did not believe any of the men were gang members, estimated they were all in their 30's, and described them as being "paisas."[2]

Suddenly, the men "jumped" N.D. and Jordy. Prior to being jumped, N.D. testified neither he nor Jordy had said anything to the men to start the fight. N.D. also had not flashed any gang signs or had otherwise attempted to engage the men. N.D. blamed the incident on the passenger of the Scion, who, according to N.D., had instigated it first by "mad-dogging" them as they walked and second, by later confronting them on the street.

N.D. and Jordy initially fought side-by-side, until N.D. was knocked to the ground. N.D. estimated the fight lasted no more than a minute. During the fight, N.D. heard a gunshot, and, after a short pause, at least one more gunshot.

Immediately after the gunshots, some of the men involved in the fight left in the Scion, while others ran away. Before hearing the gunshots, N.D. told detectives none of the men from the car or the apartment complex said anything about a gun, nor did any of them brandish a weapon. If they had,

---

[2]    Detective Zaldivar testified that a "paisas" was a "slang or a derogatory term that is used to describe a Mexican National, as opposed to someone born in the United States who was of Mexican-American decent."

N.D. said he and Jordy would have backed-off. After the gunshots, N.D. called out for Jordy, then saw him lying on the sidewalk a short distance away.

Before leaving the scene of the shooting, N.D. went to a car parked near where Jordy had been shot and broke one of its windows. N.D. believed the person who owned that car lived in the apartment complex where the men had been partying. N.D. waited for the car's owner to come outside, hoping he or she had knowledge regarding who may have shot Jordy.[3]

Police arrived at about 4:00 a.m. and found Jordy lying on the ground. An officer activated his body-worn camera, which video was played for the jury, and a transcript of which was included in the record. Jordy told police he heard a clicking sound, then started running, and realized he had been shot in the back. Jordy claimed he was "fine," but the transcript from the video shows he was struggling to breathe, as police implored Jordy to "stay awake" and "[k]eep talking."

In response to further questioning, Jordy stated he had not "claim[ed] anything," implying he was not in a gang; had no reason why anybody would want to shoot him; and had been waiting near a stop sign because he saw "suspicious" people in a car. Jordy also stated the car had been "driving slow up and down" the street past them. Jordy described the car as a "small" "white SUV" with two occupants.

Paramedics transported Jordy to the hospital, where he later died during surgery. Forensic pathologist Jacquelyn Morhaime testified she conducted an autopsy of Jordy, who sustained a gunshot wound to the right side of his back, consistent with an entrance wound. The bullet then traveled

---

[3]     As it turned out, the man who owned the car with the window broken by N.D. had nothing to do with Jordy's homicide.

through Jordy's body, perforated his interior vena cava, which is the largest vein in a person's body, and his liver, and exited his body without perforating the heart. According to Dr. Morhaime, these injuries caused significant bleeding, leading to Jordy's death.

Aureliano G. testified he lived on Comstock at the time of the shooting. Aureliano had just gotten off work and was eating his breakfast when he heard people outside arguing in Spanish. Aureliano in response raised his curtain and saw three men standing in the middle of the street. He next heard one of the men twice aggressively yell in English, "You fucked up homeboy," then two gunshots. Aureliano saw two men run to what he described as a white SUV, and another man run in a different direction. Aureliano watched the SUV drive off.

Another witness, Steven N., testified he was living with his grandmother on Morley Street on the night of the shooting when he was awakened by the sound of a gunshot. After hearing the gunshot, Steven immediately ran outside and, from the porch area, looked down Comstock Street and watched a "white box cube car speed off," which Steven identified as a Scion XB. Steven noticed the Scion had tinted windows and was missing a rim on its back left tire. A short time later, Steven saw a man helping another man, who was limping, to an area near some palm trees.

As noted, Detective Zaldivar and another detective interviewed N.D. five days after Jordy's October 15, 2016 murder, with detectives conducting a follow-up interview about a year later. Detective Zaldivar testified that the statement by the passenger in the Scion of "Que guey?" meant, "What's up, punk?" "What are you looking at?"; and that "mad-dogging" another person means to "star[e]" that person down, as if to "challenge" that person.

6

Detective Zaldivar testified N.D. during the October 20 interview was concerned about being labeled a "snitch" or "rat" for talking to police. According to Detective Zaldivar, a gang member who "snitches" could be kicked out of the gang, attacked, or even killed. Detective Zaldivar at no time offered N.D. any promises, benefits, or deals for information regarding Jordy's killing. Detective Zaldivar at trial confirmed many of the details N.D. had provided during his October 20 interview with detectives.

At the scene of the shooting, police found an expended shell casing in the street, near the curb line; a bullet projectile under a parked car; and what appeared to be a recently disposed of beer bottle. These items were impounded.

Using a computer program that maintains DNA profiles, testing from the beer bottle was traced back to DNA matching Alfredo N. Alfredo was arrested on April 11, 2017, for charges unrelated to this case. Alfredo admitted owning a white Scion in October 2016, and selling the car sometime thereafter to defendant.

DNA from the shell casing collected from the scene contained DNA from two contributors, with defendant's DNA "included with limited support as one of the contributors" on the casing. Using a statistical analysis based on the Hispanic population, it was determined that defendant was "762 times more likely" he was a contributor than not.

After being granted immunity by the court pursuant to section 1324, Luis N. testified that he and defendant had been roommates at one point, living in a house on Polk Avenue in San Diego. Prior to living on Polk, Luis testified that defendant had lived with several other roommates in an apartment complex in Linda Vista. Luis recalled going about five times to

7

visit defendant at this complex. At some point after moving from his Linda Vista apartment, defendant began driving a white Scion.

Luis testified that defendant kept a safe at their Polk house; that defendant previously had given Luis the combination to the safe; and that Luis in the past had been able to open the safe, which contained, among other items, guns owned by defendant. After defendant's arrest in late January 2017, Luis tried but was unable to open the safe. Luis told the jury he wanted to open the safe because he did not want any of defendant's belongings, including his guns, in their house. As such, Luis also moved defendant's belongings outside, onto the patio. After defendant's arrest, his girlfriend Blanca G. came to the Polk Avenue house looking for defendant's safe.

Sometime in November or early December 2016, defendant initiated a conversation with Luis about homicide. Luis recalled the conversation took place in a car when they were alone. Defendant asked Luis what he (i.e., Luis) would do if he had killed someone. Defendant also asked Luis if he had "seen the news?" Using his cellphone, defendant searched online, found a story about a homicide, then handed his phone to Luis, who testified the article involved a killing in Linda Vista. Defendant then admitted his involvement in the homicide.

Luis testified he and defendant had a second conversation about the Linda Vista homicide. Luis could not recall when this second conversation took place, as he testified it could have been "months" later, but also admitted he told detectives during an interview in October 2017 that it could have been the same day he and defendant had first spoken of the incident.

During this second conversation, defendant provided more details about the homicide, including the events leading up to it. Luis testified

8

defendant had told him that two "gang members," whom defendant also referred to as "Cholos," had been "bothering" or "bugging" defendant for some beer; that defendant "saw something chrome" or a "chrome handpiece" under the shirt of one of the gang members, which defendant believed was a gun; and that defendant in response left the street, went to the apartment complex where he was then-living, retrieved a gun from his room, "and came back down, . . . and shot" one of the gang members. Defendant told Luis he fired the gun a "couple of times."

Luis further testified defendant stated during this second conversation that his "buddy Billy" had been with him at the time of the shooting; that Alfredo also went by the name Billy; that one of the gang members, whom defendant referred to as a "cholito," had gotten away, with defendant adding, "it wasn't—it wasn't his time"; and that defendant had meant to shoot the gang member who got away, as the "one that got shot and killed—it wasn't meant for him." Luis also testified defendant had never mentioned being in a fight, or having a gun pointed at him, prior to the shooting. Nor did defendant tell Luis he had been "afraid" of the two men.

As Luis was moving defendant's belongings onto the patio of their Polk Avenue house, Luis testified he found a black handgun. Luis further testified he took the gun for his own "protection" because he "didn't know what was going on," and he wanted to "leave nothing up [to] chance[.]" At some point, Luis gave the gun to his uncle.

The record shows the parties entered into the following stipulation: "The defendant was arrested by law enforcement on January 31st, 2017. While the defendant was in law enforcement custody, his telephone calls and in-person visits were lawfully recorded by law enforcement. At the beginning

9

of each recorded conversation, the operator states in Spanish that the calls will be recorded and subject to monitoring at any time. The chain of custody was proper at all times."

San Diego Police Department detective Maria Delgadillo, whose first language is Spanish, testified she reviewed about 100 recorded conversations from February 12 to May 5, 2017 between Blanca and defendant. These conversations were in Spanish, and were the result of either in-person jail visits, or a monitored phone line. Detective Delgadillo translated some of these messages into English, which transcripts were included in the record.

Blanca at trial testified that she and defendant had been in a dating relationship for about six years and had a child together. In April 2017, Blanca went to the police station to speak with detectives. During their conversation, Blanca stated defendant about six months earlier had told her he was "very nervous" because he had "hurt" someone, but claimed he did know what had happened to this person. Defendant also told Blanca that he had gotten into "a fight with some cholos because they stared at him"; that he had been "afraid" and felt "threatened" by these men; and that the incident had been in the news. Defendant then neglected to tell Blanca he had shot and killed one of the men during the fight.

In January 2017 defendant and Blanca exchanged a series of text messages that police later recovered from defendant's cellphone. In one such message, Blanca wrote, "And overall for what you said with pride that you can take someone's life and not feel a thing." Blanca testified at or near the time she sent this message to defendant, she had become frustrated because he had promised to give her a ring as he sought to "restart" their relationship.

10

After his arrest, defendant and Blanca had several jailhouse conversations, as noted. During some of these conversations, they talked about a "box or a shoebox." Blanca testified she understood this was a reference to a safe. During at least one such conversation, defendant urged Blanca to arrange for the "box" or "shoebox" to be moved. Blanca also told detectives during other interviews that when she and defendant spoke of "perfume," that was code-speak for the guns that defendant kept inside the safe.

San Diego Sheriff Department detective Manuel Heredia testified he worked for the special investigations division. Detective Heredia, who speaks Spanish fluently, testified he and two other Spanish-speaking detectives participated in an undercover operation inside the jail on September 7, 2017 with Alfredo as the "target." The operation, which lasted a couple of hours, was recorded, portions of which were played for the jury. A transcript of various audio clips were included in the record. The purpose of the operation was to determine if Alfredo had any involvement in, or knowledge of, Jordy's murder.

During the operation, Alfredo stated that he had been transferred from federal to state custody because they wanted to charge him with a homicide; that the charge resulted from "a slight brawl" "with a dude and I threw a bottle at him and my fingerprint was on the bottle," as was his (i.e., Alfredo's) DNA; that Alfredo believed the two individuals they encountered were going to "rob us"; that Alfredo was with "another dude," and both "were already all drunk"; and that they had "scored up a bit of drugs" "or blow" as well.

Alfredo repeatedly stated he did not shoot the victim. At a later point, Alfredo reiterated they had gone to the home on Comstock Street to buy "blow" and he had been driving a Scion, which he then owned. Alfredo later

11

sold the Scion.  At some later point during the operation, Alfredo claimed that there was DNA and fingerprints on the expended "casings,"  but that there were no casings in the Scion.

At another point, Detective Kimberly Ann Collier purposely interrupted the operation and confronted Alfredo, indicating that he would be charged for murder as a co-conspirator because his fingerprints and DNA had been found on the beer bottle located at the crime scene.  Detective Collier showed Alfredo a picture of defendant, referring at one point to defendant by his nickname "Ronas."  Detective Collier then left, allowing the undercover detectives to renew their conversation with Alfredo about the shooting.

They asked Alfredo if "Ronas" had "pulled that shit out all of a sudden" as a result of being "upset or what?" to which Alfredo responded, "No, it—it was a brawl."  One of the undercover detectives asked Alfredo if "Ronas" had killed the victim.  Although Alfredo replied, "No, no," at trial Detective Heredia testified Alfredo at the same time "nodded his head up and down, referring to yes."

Alfredo during the surreptitious recording reiterated he was not scared by Detective Collier because he did not shoot the victim.  One of the undercover detectives then asked Alfredo, "Hey, well Ronas was really well armed or what?" to which Alfredo responded, "Yes, it's fucked up."  Alfredo went on to state that he had been driving the Scion and defendant had been sitting in the passenger seat on the night of the shooting; that defendant had fired a ".40" caliber gun; that after the shooting, they left together in the Scion and defendant had left the gun in the car; but that Alfredo was not concerned his DNA would be found on the gun because he had not touched it after the shooting.

Alfredo's wife Patricia C. testified she, along with her husband, were arrested in April 2017 for drug sales and transportation. Upon arrest, she spoke with detectives about the October 2016 homicide. Patricia recalled the morning after the incident Alfredo was "scared" and at one point, cried.

Patricia testified she knew defendant as "Ronas," which she believed in English meant "dirty." Alfredo told her on the morning after the shooting that he and defendant had been drinking and "some guys came by and that they wanted to start a fight"; that defendant was asleep when Alfredo told the guys he did not want to fight them; and that when defendant awakened and asked what was going on, defendant "went inside his house," "brought out a gun," and shot one of the guys. Patricia confirmed that her husband owned a white Scion at the time of the shooting, and that he later sold the car to defendant.

Patricia told the jury she initially did not believe what her husband was telling her because "he had been drinking." Alfredo also never told her that the two men they encountered had tried to rob them, or that one of the men "had flashed a gun."

## DISCUSSION

### I

### Imperfect Self-Defense

Defendant contends the court committed prejudicial error in refusing his request to instruct on voluntary manslaughter based on imperfect self-

13

defense or defense of another as set forth in CALCRIM 571.[4] Defendant

contends this was error because there was substantial evidence he shot and

---

[4]      CALCRIM 571 provides: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because (he/she) acted in (imperfect self-defense/ [or] imperfect defense of another). [¶] If you conclude the defendant acted in complete (self-defense/ [or] defense of another), (his/her) action was lawful and you must find (him/her) not guilty of any crime. The difference between complete (self-defense/ [or] defense of another) and (imperfect self-defense/ [or] imperfect defense of another) depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in (imperfect self-defense/ [or] imperfect defense of another) if: [¶] 1. The defendant actually believed that (he/she/ [or] someone else/ <insert name of third party>) was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"<The following definition may be given if requested> [¶] [A danger is imminent if, when the fatal wound occurred, the danger actually existed or the defendant believed it existed. The danger must seem immediate and present, so that it must be instantly dealt with. It may not be merely prospective or in the near future.] [¶] [Imperfect self-defense does not apply when the defendant, through (his/her) own wrongful conduct, has created circumstances that justify (his/her) adversary's use of force.] [¶] [If you find that <insert name of decedent/victim> threatened or harmed the defendant [or others] in the past, you may consider that information in evaluating the defendant's beliefs.] [¶] [If you find that the defendant knew that <insert name of decedent/victim> had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs.] [¶] [If you find that the defendant received a threat from someone else that (he/she) associated with <insert name of decedent/victim>, you may consider that threat in evaluating the defendant's beliefs.]

killed Jordy based on an actual, albeit unreasonable, belief in the need to defend himself and/or Alfredo.

A. *Brief Additional Background*

At the close of the People's case-in-chief and outside the presence of the jury, the defense requested the court instruct on perfect and imperfect self-defense, CALCRIM 505 and 571, respectively, and voluntary intoxication, CALCRIM 3426 (discussed *post*).

As relevant to the issue here, the defense made an offer of proof that CALCRIM 571 should be given because there was evidence defendant saw one of the men they encountered (i.e., N.D.) with a gun, and because Alfredo had said during the recorded jail operation that the two men were going to "rob us."

The prosecution opposed giving the instruction, claiming there was insufficient evidence to show that defendant's "actual but unreasonable" belief in the need to defend himself or Alfredo was the result of "imminent" harm or peril. The prosecution went on to note that even assuming N.D. had a gun, which he repeatedly denied, defendant nonetheless "went back to his apartment, then came out again, and that's when he shot the other person." After hearing additional argument, the court refused to give CALCRIM 571 based on the lack of substantial evidence to show defendant believe he needed to defend himself or Alfredo from "imminent" harm or peril.

---

"[Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.] [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in (imperfect self-defense/ [or] imperfect defense of another). If the People have not met this burden, you must find the defendant not guilty of murder."

15

B. *Guiding Principles*

We review de novo a trial court's decision not to give a particular instruction, including imperfect self-defense. (See *People v. Simon* (2016) 1 Cal.5th 98, 133 (*Simon*); *People v. Waidla* (2000) 22 Cal.4th 690, 733 (*Waidla*).) No such instruction is warranted "absent substantial evidence to support [it]." (*People v. Stitely* (2005) 35 Cal.4th 514, 551 (*Stitely*).) In reviewing the evidence supporting an instruction, we construe the record in the light most favorable to the defendant. (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483 (*Wright*).)

" ' "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he [or she] was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." [Citation.] . . . [Citation.] [I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter. Thus the trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter. [Citation.]' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*); see § 187, subd (a).)

The doctrine of imperfect self-defense " 'is narrow. It requires without exception that the defendant must have had an actual belief in the need for self-defense. . . . Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.

16

" '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with.' " ' " (*Manriquez, supra,* 37 Cal.4th at p. 581.)

C. *Analysis*

In this case, the *only* evidence to show defendant may have held an actual belief in the need for self-defense or defense of another was provided by the testimony of Luis, defendant's one-time roommate, and by Blanca, defendant's girlfriend and the mother of his child.

Luis's testimony was based on a conversation with defendant after defendant admitted his involvement in the homicide. As summarized *ante*, in this conversation defendant told Luis that two "Cholos," or gang members, were "bugging" him for some beer; and that defendant saw one of the alleged gang members—presumably N.D. —with "something chrome" or a "chrome handpiece" under his shirt, which defendant believed was a gun.

More important to the instant issue, defendant *also* told Luis that, after he thought he saw one of the men with something "chrome" under his shirt, defendant *left* the street, went to his apartment, where presumably it was safe, armed himself with a .40 caliber gun, and then *returned* to the street. On his return, defendant next confronted the two men, saying "Que guey? Que guey?" Detective Zaldivar testified this meant, "What's up, punk?" and "What are you looking at?"

The record further shows when defendant spoke to Blanca about the homicide, he merely told her he had gotten into a "fight with some cholos because they *stared* at him." Defendant did not tell Blanca he had shot and killed a man, nor did he tell her that he had seen one of the men with "something chrome" under his shirt. As testified to by Blanca, when

17

defendant discussed his involvement in the incident, he stated he felt "afraid" and "threatened" by the men, but provided no facts to explain why that was the case.

Moreover, N.D. testified neither he nor Jordy knew the two men in the Scion, or why defendant was mad-dogging them, as the car drove slowly past them. N.D. further testified that neither he nor Jordy were armed with any weapon, including a gun; that he had never seen Jordy with a gun; that they did not engage the men in the Scion in any way; that instead, they were concerned enough by the behavior of the Scion passenger (i.e., defendant) to pause on the sidewalk, as they waited for the car to park, and then watched its occupants go into an apartment complex; that after the men went into the apartment complex, only then did they continue on Comstock Street to M.L.'s home, but found the front door locked; that the two men from the Scion within minutes returned, accompanied by more men, some of whom were holding beer bottles; that defendant then confronted him and Jordy, as noted; and that the men without warning then jumped them in what Alfredo described as a "slight brawl."

In addition, Alfredo, the driver of the Scion, never mentioned either N.D. or Jordy having a gun when he spoke to his wife Patricia the morning after the homicide, and when detectives surreptitiously interviewed him in his jail cell for more than two hours. Although Alfredo told the detectives during the jailhouse operation he was concerned the two men they encountered might "rob us," he never mentioned this fact to his wife the morning after the homicide, when he told her he was scared and when he cried as he discussed the incident. Alfredo also told detectives during the interview that it was "fucked up" that defendant, whom Alfredo referred to by the nickname "Ronas," was "really well armed."

18

Based on this record, construing it, as we must, in the light most favorable to defendant (see *Wright*, *supra*, 242 Cal.App.4th at p. 1483), we independently conclude there was insufficient evidence to support a finding that defendant actually feared that N.D. or Jordy posed an " 'imminent danger to life or great bodily injury' " that " ' " 'must be *instantly* dealt with.' " ' " (See *Manriquez*, *supra*, 37 Cal.4th at p. 581, italics added; see also *People v. Sakarias* (2000) 22 Cal.4th 596, 621 [no state or federal constitutional error occurs, requiring reversal for failure to instruct the jury regarding a lesser included offense, when the evidence in support of that offense "was, at best, extremely weak"]; *People v. Hill* (2005) 131 Cal.App.4th 1089, 1102 [noting where a "defendant did not testify as to any apprehension or danger he may have felt" and no other witness testified that he "acted out of reasonable fear," there was "no substantial evidence of perfect self-defense" to support an instruction], overruled on another ground as stated in *People v. French* (2008) 43 Cal.4th 36, 48, fn. 5.)

Defendant on appeal contends for the first time that, whenever there is evidence to support a perfect self-defense instruction, which was given in this case, as a matter of law an imperfect self-defense instruction also must be given. Defendant relies on cases such as *People v. Ceja* (1994) 26 Cal.App.4th 78, 85–86 (*Ceja*) to support this contention.

Putting aside that the majority opinion in *Ceja* does not stand for the proposition cited by defendant—only the concurrence (see *Ceja*, *supra*, 26 Cal.App.4th at pp. 88–89), to the extent that *Ceja* can be construed to stand for the proposition defendant suggests, courts have disagreed with it. (See *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1273 [determining that the evidence adduced at trial did not require an instruction on imperfect self-defense and rejecting any suggestion in *Ceja* that imperfect self-defense must

19

be given whenever a perfect self-defense instruction is warranted by the evidence]; see also *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1231.)

More important, "[t]he jury's verdict finding [defendant] guilty of the first degree murder of [Jordy] implicitly rejected [his] version of the events, leaving no doubt the jury would have returned the same verdict had it been instructed regarding imperfect self-defense. [Citation.] Accordingly, even if we were to assume the failure to instruct on imperfect self-defense violated [defendant's] constitutional rights, we would find the error harmless. [Citation.]"[5] (See *Manriquez, supra,* 37 Cal.4th at pp. 582–583, citing *People v. Lewis* (2001) 25 Cal.4th 610, 646; compare *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179 [trial court erred in failing sua sponte to instruct on imperfect self-defense where "prosecution's chief witness against appellant testified [the victim] was choking appellant when appellant drew his gun and shot [the victim]" because, in light of that evidence, "[i]t was for the jury sitting as the trier of fact to decide whether appellant actually feared serious injury or death from being choked"].)

---

[5]     Our high court has held that, in a noncapital case, "[a]ny error in failing to instruct on imperfect defense of others is state law error alone, and thus subject, under article VI, section 13 of the California Constitution, to the harmless error test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 [(*Watson*)]." (See *People v. Randle* (2005) 35 Cal.4th 987, 1003, overruled on another ground as stated in *People v. Chun* (2009) 45 Cal.4th 1172, 1201; see also *People v. Breverman* (1998) 19 Cal.4th 142, 178 [concluding in cases such as here that "error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*Watson*]".) In any event, in light of the scant record evidence that defendant actually feared that N.D. or Jordy posed an " 'imminent danger to life or great bodily injury' " requiring defendant's immediate action (see *Manriquez, supra,* 37 Cal.4th at p. 581), we conclude this error was also harmless under *Chapman v. California* (1967) 386 U.S. 18, 24 [applying harmless beyond a reasonable doubt standard].

For all these reasons, we conclude the trial court did not err in refusing defendant's request to instruct on imperfect self-defense. (See *Stitely*, *supra*, 35 Cal.4th at p. 514.)

II

Voluntary Intoxication

Defendant next contends the court erred in failing to instruct the jury with CALCRIM No. 3426[6] regarding the principles of voluntary intoxication.

A. *Brief Additional Background*

The record shows defense counsel made the following offer of proof in support of such an instruction: "I believe the prosecution has offered many witnesses, specifically Alfredo . . ., to say that they were very drunk, he was drunk, they were high on drugs. I believe it's the People's theory that [Alfredo] and Mr. Sanchez were together. And if so, there is evidence that

---

[6] CALCRIM 3426 provides: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted [or failed to do an act] with <insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that …' or 'the intent to do the act required'>.

"A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] In connection with the charge of <insert first charged offense requiring specific intent or mental state> the People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with <insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .'>. If the People have not met this burden, you must find the defendant not guilty of <insert first charged offense requiring specific intent or mental state>. [¶] <Repeat this paragraph for each offense requiring specific intent or a specific mental state.> [¶] You may not consider evidence of voluntary intoxication for any other purpose. [Voluntary intoxication is not a defense to <insert general intent offense[s]>.]"

21

they were drunk and on drugs." The prosecutor responded CALCRIM 3426 was not warranted in this case because there was no evidence defendant, as opposed to Alfredo, was drunk or on drugs. The record shows the court initially agreed to give the voluntary intoxication instruction.

However, after a recess the court outside the presence of the jury reconsidered whether to give CALCRIM 3426 after the prosecutor cited the case of *People v. Williams* (1997) 16 Cal.4th 635, 677–678 (*Williams*). Relying on *Williams*, the prosecutor argued that "Defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " Thus, the prosecutor argued that, even if there was substantial evidence defendant, as opposed to Alfredo, was intoxicated, "there was no evidence at all that the voluntary intoxication had any effect on the defendant's ability to formulate intent." Relying on *Williams*, the court withdrew CALCRIM 3426.

B. *Guiding Principles and Analysis*

Section 29.4 governs the admissibility of evidence of voluntary intoxication. This statute in part provides: "[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).)

As explained by our high court in *Williams*, a "defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' (*People v. Horton* (1995) 11 Cal.4th 1068, 1119; see also *People v. Saille* (1991) 54 Cal.3d 1103, 1117 [explaining that a

22

defendant charged with murder is free to show that 'because of his mental illness or voluntary intoxication, he did not *in fact* form the intent unlawfully to kill' (original italics)].)" (*Williams*, *supra*, 16 Cal.4th at p. 677.) We review de novo a trial court's decision not to give a particular jury instruction. (See *Simon*, *supra*, 1 Cal.5th 98 at p. 133; *Waidla*, *supra*, 22 Cal.4th at p. 733.)

The facts of the instant case are similar to those in *Williams*, where our high court found insufficient evidence to warrant a voluntary intoxication instruction. In *Williams*, the defendant relied on a witness's testimony that the defendant was " 'probably spaced out' " on the morning of the killings, and comments the defendant made in a recorded interview with police that around the time of the killings, he was " 'doped up' and 'smokin' pretty tough then.' " (*Williams*, *supra*, 16 Cal.4th at p. 666.) The *Williams* court found that, "even if we consider all three of these statements, there was no error. Assuming this scant evidence of defendant's voluntary intoxication would qualify as "substantial," there was no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent." (*Id.* at pp. 677–678.)

Here, the evidence proffered by defendant is not unlike the evidence deemed insufficient in *Williams* to warrant a voluntary intoxication instruction. Defendant relies primarily on Alfredo's statements that "we" had been drinking, "we" were drunk, and "we" had bought "drugs" including "blow," at or near the time of the shooting. Even assuming "we" means defendant, there is no evidence showing how much defendant had been drinking that night, when he had been drinking, what he was drinking, or whether he took drugs. Construing the evidence in the light most favorable to defendant (see *Wright*, *supra*, 242 Cal.App.4th at p. 1483), we conclude the

23

record is devoid of substantial evidence to support a finding defendant was voluntary intoxicated at the time of the shooting.

Moreover, even if such scant evidence was substantial, in reliance on *Williams* we further conclude the record is devoid of evidence, much less substantial evidence, that his (alleged) voluntary intoxication "had any effect on defendant's ability to formulate intent." (See *Williams*, *supra*, 16 Cal.4th at p. 678.)[7] For this separate reason, we reject his claim of instructional error.

III

Perfect Self-Defense, and Involuntary Manslaughter Based on Sudden Quarrel/Heat of Passion

Defendant next contends the court erred when it instructed on various defenses because the instructions were misleading in failing to apprise the jury it could consider defendant's belief in the need to use deadly force in response to a robbery, battery, and/or assault being committed by N.D. and/or victim Jordy. We find this contention unavailing.

Initially, we note the defense did not seek any clarification to, or modification of, these instructions, which correctly stated the law. As such, on appeal he has forfeited this claim of error. (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1165 [noting a " 'party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial' "], quoting *People v. Hillhouse* (2002) 27 Cal.4th 469, 503; see also *People v. Lee* (2011) 51 Cal.4th 620, 638 [recognizing the rule that a "trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a

_____

7 In light of our decision, we deem it unnecessary to address the People's alternate contention that the failure to instruct on voluntary intoxication was harmless error.

24

request from counsel," and that the "failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal"]; *People v. Hart* (1999) 20 Cal.4th 546, 622 [failure to request clarifying instruction at trial forfeits claim on appeal].)

Assuming arguendo this claim of alleged error was properly preserved for review, we find it has no merit.

As noted, the record shows the jury was instructed on perfect self-defense/defense of another,[8] and voluntary manslaughter based on a sudden

<hr />

[8] The court instructed the jury as follows with CALCRIM 505: "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if: [¶] 1. The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself or someone else. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. [¶] If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death/great bodily injury has passed. This is so even if safety could have been achieved by retreating.

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

25

quarrel and/or in the heat of passion.[9] If the jury believed that N.D. or Jordy was attempting to rob and/or assault defendant or his companion Alfredo, the jury instructions that were given—including the difference between first and

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."

[9]     The jury was instructed with CALCRIM 570 as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

second degree murder,[10] and lawful and unlawful homicide[11]—would have allowed it to find defendant guilty of something less than first degree murder, including no crime at all.

[10]     The court instructed the jury with CALCRIM 520 as follows:  "The defendant is charged in Count 1 with murder in violation of Penal Code section 187. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] 2. When the defendant acted, he had a state of mind called malice aforethought; [¶] AND [¶] 3. He killed without lawful excuse or justification.
        "There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. [¶] The defendant acted with implied malice if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life.
        "Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time. [¶] An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.
        "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No 521."

[11]     The jury was instructed with CALCRIM 500 as follows:  "Homicide is the killing of one human being by another.  Murder is a type of homicide. The defendant is charged with murder. [¶] A homicide can be lawful or unlawful.  If a person kills with a legally valid excuse or justification, the killing is lawful and he or she has not committed a crime.  If there is no

27

Moreover, our conclusion any error in failing to clarify and/or modify the various instructions was not prejudicial is further supported by the defense's theory at trial. This defense theory was *not* that defendant acted in self-defense; or was provoked; or was concerned he was going to be robbed; or would suffer great bodily injury, or worse, during what Alfredo described as a "slight brawl" between defendant's group and Jordy and N.D.; but rather that defendant was *not* the shooter.

Indeed, the record shows defense counsel at closing noted how the prosecution's key witnesses—N.D., Alfredo, and Luis—each lacked credibility, how each had been in trouble with the law and was facing criminal charges of his own, and how each therefore had a motive to lie after law enforcement allegedly pressured each of them unfairly to blame defendant for the killing.

Defense counsel next turned to defendant. Counsel argued the DNA evidence found on the bullet casing recovered at the crime scene, suggesting there was a "1 and 762" chance defendant was a minor contributor, was too low to be reliable. Counsel further argued that the bullet casing was the only "physical evidence" showing defendant was even present at the shooting; that the gun which killed Jordy was never recovered; and that it strained logic for defendant to buy the Scion from Alfredo after the car was identified at the scene of the homicide.

After suggesting law enforcement ignored many other leads that potentially would have led to the true identity of the shooter, counsel then

---

legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter. You must decide whether the killing in this case was unlawful and, if so, what specific crime was committed. I will now instruct you in more detail on what is a legally permissible excuse or justification for homicide. I will also instruct you on the different types of murder."

28

stated: "Orlando Sanchez did not kill Jordy L[.] *He was not the shooter*, and he is not guilty. [¶] Thank you." (Italics added.)

Because defendant fully presented, and the jury was able to fully consider, his defense theory even absent a clarification or modification of the various instructions summarized *ante*, we conclude any error was harmless under any standard. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [finding no prejudice from refusal to give defense pinpoint instruction because other instructions did not preclude jury from finding for the appellant and defense counsel otherwise "fully explicated" the defense to the jury]; *People v. Earp* (1999) 20 Cal.4th 826, 887 [finding no prejudice from refusal to give the appellant's requested instructions because other instructions were adequate and the jury knew the defense theory from defense counsel's arguments]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1111 [finding no prejudice from trial court's erroneous refusal to give instruction based on eyewitness identification expert's testimony in part because the court gave other eyewitness testimony instructions and defense counsel summarized testimony in closing]; *People v. Wharton* (1991) 53 Cal.3d 522, 571–572 [recognizing that in evaluating the impact of a trial court's refusal to give a pinpoint instruction, a reviewing court should consider " ' "the entire cause, including the evidence," ' " defense counsel's focus in closing argument on the evidence supporting the defense theory, and whether any given

instructions would have precluded the jury "from giving that evidence its due weight"].)[12]

IV

Fines, Fees, and Assessments

Finally, defendant contends the court's imposition of various fines, fees, and assessments at defendant's May 13, 2019 sentencing violated his constitutional rights because the court imposed them without first determining his ability to pay, as required under *Dueñas*, *supra*, 30 Cal.App.5th 1157. We reject this contention.

A. *Brief Additional Background*

At defendant's May 13 sentencing, he submitted to the probation report, except with respect to the gun allegation. Counsel also asked the court to consider defendant's "minimal criminal history," then stated, "we would agree to the restitution amount as well."

As relevant to this issue, the court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)) and a matching probation revocation fine (§ 1202.45); a $60 court operations assessment (§ 1465.8); an $80 probation revocation fee (§ 1202.44); and a $154 criminal justice administration fine (Gov. Code,

---

[12]     As noted, defendant contends that, when considered together, his three claims of instruction error denied him a fair trial under the cumulative error doctrine. Under this doctrine, the cumulative effect of several trial errors may be prejudicial even if they would not be prejudicial when considered individually. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 60, overruled in part on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) Here we have found that no instructional error occurred and that, in any event, any conceivable error was harmless. As such, we conclude the cumulative error doctrine does not apply in this case. (See *People v Lu*a (2017) 10 Cal.App.5th 1004, 1019 [concluding the cumulative error doctrine did not apply because there was "no error, though we have considered the issue of prejudice as an alternative basis for rejecting defendant's claims of error"].)

§ 29550.) The court also ordered defendant to pay $5,512 to the victim's compensation program for funeral expenses (§ 1202.4, subd. (f)); and issued a general order of victim restitution to family members of Jordy in amounts to be determined by the court.

B. *Guiding Principles and Analysis*

As relevant here, pursuant to section 1202.4, subdivision (b), the court is required to impose a minimum $300 restitution fine, up to a maximum of $10,000, which is the amount of the fine imposed in this case. Subdivision (c) of section 1202.4 provides that a defendant may object on the ground of inability to pay to any fine above the statutory minimum. Defendant at sentencing therefore had a statutory right to object to $9,700 of the restitution fine imposed by the court. Defendant's failure to avail himself of this right forfeits his claim of error as to this particular fine. That is, if defendant did not object to the imposition of $9,700 of this fine, his claim of error with respect to the small balance of that fine is also forfeited.

Moreover, we note defendant at sentencing submitted to the probation report, including to the amount owed in "restitution." The probation report recommended the court impose the $10,000 restitution fine under section 1202.4, subdivision (b). The probation report further recommended the other fines, fees, and assessments in the amounts actually imposed by the court. For this separate reason, we conclude defendant has forfeited his claim of error based on inability to pay.

In addition, *Dueñas* was decided in January 2019. Regardless of whether that case and its holding were foreseeable and substantively correct,

31

which clearly is open to debate,[13] defendant was on notice of his potential right to object under *Dueñas* at his May 2019 sentencing—months after that opinion issued.  For this separate reason, defendant's claim of error based on inability to pay is forfeited.

Finally, even if the ability-to-pay issue is not forfeited, we find *Dueñas* distinguishable from the fact of the instant case.  Defendant here, unlike Ms. Dueñas who was on probation (see *Dueñas*, *supra*, 30 Cal.App.5th at p. 1160), is serving a lengthy prison sentence, allowing him to earn wages and pay the fines, fees, and assessments imposed by the court.  (See *Kopp*, *supra*, 38 Cal.App.5th at p. 96 [noting that a defendant's ability to pay various fines, fees, and assessments may also be considered by the length of his or her prison term and his or her ability to earn prison wages], citing *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [ability to pay includes a defendant's capacity to earn prison wages], and § 2085.5 [outlining how a restitution fine balance may be collected from prison wages].)

---

[13]     The issue of the viability of *Dueñas* and its constitutional underpinnings, requiring an ability to pay hearing before various fines, fees, and assessment may be imposed on a defendant, is currently pending before our high court.  (See, e.g., *People v. Kopp* (2019) 38 Cal.App.5th 47 (*Kopp*), review granted Nov. 13, 2019, S257844; *People v. Hicks* (2019) 40 Cal.App.5th 320 [*Dueñas* improperly expanded the boundaries of due process], review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1060 ["*Dueñas* was wrongly decided" and should have based its analysis on the Eighth Amendment's excessive fines clause instead of the due process clause].)

## DISPOSITION

The judgment is affirmed.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.